# In the United States Court of Federal Claims

No. 22-72 C
Filed Under Seal: May 16, 2022
Reissued: June 8, 2022[*]

```
* * * * * * * * * * * * * * * *** *
                                 *
ASCENDANT SERVICES, LLC,         *
                                 *
                    Plaintiff,   *
                                 *
        v.                       *
                                 *
THE UNITED STATES,               *
                                 *
                    Defendant,   *
                                 *
and                              *
                                 *
CAELUM RESEARCH                  *
CORPORATION,                     *
                                 *
            Defendant-Intervenor.*
                                 *
* * * * * * * * * * * * * * *** *
```

*W. Brad English*, with whom were *Jon D. Levin*, *Emily J. Chancey*, *Joshua B. Duvall*, and *Nicholas P. Greer*, Maynard, Cooper & Gale, P.C., all of Huntsville, AL, for Plaintiff.

*Ioana Cristei*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Franklin E. White, Jr.*, Assistant Director, *Patricia M. McCarthy,* Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, all of Washington, D.C., for Defendant, and *Captain Timothy M. McLister*, Trial Attorney, U.S. Army Legal Services Agency, of Fort Belvior, VA, of counsel.

*Beth V. McMahon*, ReavesColey, PLLC, of Chesapeake, VA, for Defendant-Intervenor.

---

[*]    Pursuant to the protective order entered in this case, this opinion was filed initially under seal.  The parties provided proposed redactions of confidential or proprietary information.  In addition, the Court made minor typographical and stylistic corrections.

<u>**OPINION AND ORDER**</u>

**SOMERS,** Judge.

On January 24, 2022, Plaintiff, Ascendent Services, LLC ("Ascendant"), filed a protest in this Court challenging the United States Army's award of an information technology, logistics, and cybersecurity support contract to Defendant-Intervenor, Caelum Research Corporation ("Caelum"). Plaintiff argues that the Army misapplied the solicitation's key personnel requirements and that other aspects of the Army's evaluation were irrational.

On May 9, 2022, the Court issued an order denying Plaintiff's motion for a permanent injunction, explaining that Plaintiff failed to meet its burden to establish that it is entitled to an injunction because, *inter alia*, the Army did not erroneously evaluate the solicitation's key personnel requirements and Plaintiff did not prove by a preponderance of the evidence that the Army made any other prejudicial errors in its evaluation of the proposals. This opinion provides the reasons behind the Court's May 9th order, denies Plaintiff's motion for judgment on the administrative record, and grants the government's and Defendant-Intervenor's cross-motions for judgment on the administrative record.

## BACKGROUND AND PROCEDURAL HISTORY

On March 1, 2021, the Army issued solicitation number W91CRB-21-R-0017 ("solicitation" or "RFP") seeking proposals for "a services contract to provide Information Technology (IT), IT logistics, and cybersecurity support" at four Army installations: the Army Test and Evaluation Command ("ATEC") Headquarters; the Army Evaluation Center; the U.S. Army Aberdeen Test Center; and the Operational Test Command at Fort Hood. AR 245, 249. The solicitation informed offerors that services may also be required at other locations "throughout the life of [the] contract." AR 249. A crucial part of the awardee's services would be to support ATEC in its mission to relay essential information to soldiers on the battlefield while performing technological operations testing. ECF No. 29-1 at ¶ 5; AR 249–50.

The solicitation provided that the Army would evaluate offerors' proposals in two phases. AR 340. The first phase filtered out offerors that lacked the requisite experience to meet the solicitation's requirements. *Id.* Of the twenty-four proposals submitted, twenty-one were selected to move forward to the second phase of the evaluation. AR 8136–39, 8667, 8752. The second phase consisted of a three-factor evaluation process to select the awardee: (1) Past Performance; (2) Cost; and (3) Management Factor. AR 336–37.

Past performance required offerors to list and describe "recent and relevant contracts" that had similar requirements to those of the solicitation. AR 339. Offerors received one of two ratings under Past Performance:

> ***Acceptable***: Based on the offeror's performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is unknown.

> **Unacceptable:** Based on the offeror's performance record, the Government has no reasonable expectation that the offeror will be able to successfully perform the required effort.

AR 341.

With regard to cost, offerors were to submit a cost proposal detailing their costs on an Excel spreadsheet. AR 337–38. Finally, offerors' management approach, which was significantly more important than cost, was rated on an adjectival scale:

> **Outstanding.** Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low.

> **Good.** Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low.

> **Acceptable.** Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate.

> **Marginal.** Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high.

> **Unacceptable.** Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable.

AR 341.

The Army evaluated offerors' management approach on two elements. The first element evaluated whether the offeror adequately provided responses in its proposal that met the "requirements specified in the RFP" and the "extent to which each requirement has been addressed in the proposal." AR 342. The second element examined whether the offeror's approach was feasible: the "extent to which the proposed approach is workable and the end results achievable," the "extent to which successful performance is contingent upon proven techniques," and the "extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule." *Id.* The Army rated components of offerors' proposals for these evaluations based on the following:

> **Deficiency:** A material failure of a proposal to meet a government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

**Strength**: Any aspect of a proposal when judged against a stated evaluation criterion, enhances the merit of the proposal or increases the probability of successful performance of the contract.

**Weakness**: A flaw in the proposal that increases the risk of unsuccessful contract performance.

AR 211.

Of the twenty-one proposals that qualified for consideration in the second phase of the evaluation, fourteen were rated "Unacceptable" under the Management Factor and were removed from award contention.  The Army rated the remaining seven offerors as follows:

| Offeror | Total Evaluated Price | Management | Past Performance |
|---|---|---|---|
| ███ | ███ | Acceptable | Acceptable |
| | | Good | Acceptable |
| | | Acceptable | Acceptable |
| Caelum | $85,780,380 | Outstanding | Acceptable |
| Ascendant | $88,012,684 | Marginal | Acceptable |
| | | Marginal | Acceptable |
| ██ | ██ | Good | Acceptable |

AR 8815.

The Army awarded strengths and weaknesses for these seven offerors as follows:

| Evaluation Result | ███ | ███ | ███ | Caelum | Ascendant | ███ | ██ |
|---|---|---|---|---|---|---|---|
| Strengths | 0 | 5 | 0 | 9 | 0 | 1 | 3 |
| Weaknesses | 0 | 0 | 0 | 0 | 3 | 5 | 2 |

AR 8754.

In an information packet dated July 23, 2021, the peer review board for the evaluation recommended Caelum's proposal as the best value to the Army and recommended awarding Caelum the contract.  The recommendation was based on Caelum's proposal receiving nine strengths, zero weaknesses, and it being the only offeror rated "Outstanding" under management approach.  AR 8663–92, 8766.

On July 26, 2021, the Army notified the other offerors of the decision to award the contract to Caelum.  AR Tab 90.  Plaintiff and two other offerors filed size protests challenging Caelum's eligibility to be awarded the contract.  AR Tabs 95–97.  The Small Business Administration ("SBA") dismissed the size protests in a decision dated August 25, 2021.  AR 9712–15.  Plaintiff's subsequent appeal to the SBA's Office of Hearings and Appeals was denied on December 2, 2021.  AR 9760.

4

On December 15, 2021, the Army notified Plaintiff that Caelum would be awarded the contract.  AR 10048.  On January 13, 2022, the Army completed debriefing Plaintiff about the award decision and provided responses to its questions.  AR 10449; ECF No. 26 at 6 ("Pl.'s MJAR").  Plaintiff filed the instant protest on January 24, 2022.

## DISCUSSION

### A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."  28 U.S.C. § 1491(b)(4).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

On the first ground, "courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  *Id.* (citations and internal quotations omitted).  Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Id.* at 1332–33 (citations and internal quotations omitted).  On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Id*. at 1333 (citation and internal quotation omitted).  In the case of a negotiated procurement, such as a "best value" procurement, the burden on a plaintiff of proving an award was arbitrary, capricious, an abuse of discretion, or contrary to law is heavier than it is in other protests.  *See, e.g.*, *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir. 1996) ("This court . . . must afford great deference to agencies' decisions in relation to procurement.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record."  *Id.* at 1355–56.  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

**B.**    **Plaintiff Fails to Demonstrate that the Army Misapplied the Solicitation's Key Personnel Requirements**

In phase two of the evaluation, the Army rated offerors on an adjectival scale for their management approach.  AR 603.  As part of their management approach, offerors were required to propose three key personnel: one program manager and two project managers.  AR 540–41, 598, 603.  These three key personnel (as well as other non-key personnel) were required to have certain relevant education and experience in accordance with the education/experience matrices that the solicitation provided for each position.  Failure to propose key personnel that met the educational and experience requirements would result in a deficiency being assigned and, per the solicitation, any proposal with one or more deficiencies was unawardable.  AR 211, 341.

With regard to key personnel, Plaintiff asserts that Caelum should have been rated "[u]nacceptable under the Management Factor and removed from the competition for failing to propose key personnel with the required education and experience."  Pl.'s MJAR at 10.  Moreover, Plaintiff further asserts that three other offerors should also have been eliminated for the same reason.  Plaintiff's argument rests on its interpretation of the education and work experience the solicitation required for the program manager and two project manager positions, as well as what it views as the Army's misapplication of this requirement.  *See id.* at 10–16.  For the reasons explained below, Plaintiff's interpretation is unreasonable, contravenes the plain meaning of the solicitation's terms and, if adopted by the Court, would not only make Caelum, ██████, ██, and ███████ unacceptable, but would also make Plaintiff's own proposed key personnel unacceptable.

As referenced above, the solicitation provided an education/experience matrix for the program manager position detailing the requisite years of experience an offeror's proposed program manager had to possess depending on the level of relevant education the individual has completed.  To satisfy the solicitation's requirements, the program manager matrix provided as follows:

| Program Manager Education and Experience Requirement | | |
|---|---|---|
| **Acquired Degree** | | **Experience Range** |
| High School/GED | | ≥ 18 years |
| Associates directly related field | AND | ≥ 13 years |
| Bachelors in directly related field | | ≥ 11 years |
| Masters in directly related field | | ≥ 9 years |

AR 647.  In addition, in the text immediately following this matrix, the solicitation provided that a proposed program manager must have "10 years leading 50 or more employees" and that "[r]elevant education/experience must be in an IT discipline related to the assigned program area (e.g., Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc.) . . . ."  *Id.*

A similar education/experience matrix detailed the requirements for the two project manager positions:

| Project Manager Education and Experience Requirement | | |
|---|:---:|:---:|
| **Acquired Degree** | | **Experience Range** |
| High School/GED | | ≥ 13 years |
| Associates directly related field | AND | ≥ 11 years |
| Bachelors in directly related field | | ≥ 9 years |
| Masters in directly related field | | ≥ 7 years |

*Id*. As with the program manager position, the text immediately following this chart contained further requirements: "5 years experience leading 20 or more employees. Relevant education/experience must be in an IT discipline related to the assigned program area (e.g., Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc.)." *Id*.

Plaintiff takes issue with the Army's interpretation of the following sentence, which appeared in the requirements for both the program manager and project manager positions: "Relevant education/experience must be in an IT discipline related to the assigned program area (e.g., Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc.)." According to Plaintiff, this language means that the required "experience" for a proposed program manager had to be attained in "IT program management" position(s) and, similarly, in "IT project management" for proposed project managers. Pl's MJAR at 14. Non-program or project manager experience cannot, according to Plaintiff, satisfy the requirement. Under Plaintiff's interpretation of the sentence, Caelum and three other offerors should have been rated "unacceptable" and eliminated from competition because at least one of each of their proposed key personnel did not meet the requirements.

The Army evaluators, however, interpreted this sentence as requiring proposed program and project managers to have the requisite years of experience in an "IT discipline," not specifically as a program or project manager. Thus, under the Army's interpretation, a proposed program manager needed ten years of experience leading fifty or more employees in an IT discipline and additional, but overlapping, experience in an IT discipline in accordance with the education/experience matrix. The same was true for the proposed project managers, except the required management experience was five years leading twenty or more employees. Accordingly, for example, under the Army's interpretation, a program manager who had an associate degree in a directly related field would need at least eleven years of experience in an IT discipline related to the assigned program area, of which at least ten years would need to have been spent leading fifty or more employees.

After reviewing the parties' arguments and reading the key personnel related provisions in the context of the solicitation as a whole, it is clear to the Court that the Army correctly applied the plain meaning of the solicitation's terms in evaluating offerors' proposed key personnel. "Interpretation of the terms in a solicitation is a question of law over which this Court exercises *de novo* review without deference to an agency's interpretation." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 733 (2021) (citing *NVT Techs., Inc. v. United States*, 370

F.3d 1153, 1159 (Fed. Cir. 2004)).  The interpretation of a solicitation's terms begins with the plain language of the document, *see, e.g.*, *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc), which "must be given that meaning that would be derived from the [solicitation] by a reasonably intelligent person acquainted with the contemporaneous circumstances," *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (internal quotation marks omitted).  "[A]ny subjective, unexpressed intent of one of the parties is ineffective." *Sterling, Winchester & Long, L.L.C. v. United States*, 83 Fed. Cl. 179, 183 (2008). Furthermore, the solicitation at issue "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs.*, 370 F.3d at 1159.  Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id.* (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

To review, the disputed sentence reads as follows: "Relevant education/experience must be in an IT discipline related to the assigned program area (e.g., Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc.) . . . ."  AR 647.  This sentence is straightforward.  The education/experience matrix contained requirements for the experience an individual needs to have, given the degree he or she holds.  The base level of experience was eighteen years for the program manager position and thirteen years for the project manager positions.  This base level experience applied to any person who did not have an undergraduate or graduate degree in a "directly related field."  If a person had a degree in a directly related field, then the required years of experience decreased.  In addition, both positions required a certain number of years of experience leading a certain number of people.  Thus, the purpose of the sentence is to make clear that for both the education and experience described in the matrix and the number of years of experience leading a group of people, the education and experience had to be in "an IT discipline" and that this IT discipline had to be "related to the assigned program area."  The sentence then goes on to provide examples of types of IT disciplines that qualify as related to the assigned program area.  Although the IT disciplines given as examples were the same for both the program manager and the project manager positions, they varied for non-key personnel positions.  *See, e.g.*, AR 382–83 (for the role of Cloud Engineer I, the "IT discipline" examples include "Computer Science, Computer Information Systems, Computer/Software Engineering, Management Information Systems").

For both the program manager and the project managers, the example IT disciplines were: "Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc."  Accordingly, if a program manager, for instance, had a bachelor's degree in history (an obviously unrelated field) and had eighteen years of experience in Network Engineering, including ten years leading fifty or more people, this individual would satisfy the solicitation's requirement.

Ignoring the plain language of the solicitation, Plaintiff offers an alternative interpretation.  According to Plaintiff, the experience for a proposed program manager not only had to be in an IT discipline but had to be as a program manager in that IT discipline.  Plaintiff

makes this same argument for the proposed project managers.  There are several problems with Plaintiff's approach.

First, Plaintiff's "argument" is not so much of an argument but more of a blanket assertion.  As pointed out above, contract interpretation begins with the language of the contract.  However, rather than spending time analyzing the language of the contract and attempting to demonstrate how it supports Plaintiff's interpretation, Plaintiff simply asserts that the relevant experience for the program manager had to be in IT program management and the experience for the project manager had to be in IT project management.  Plaintiff then jumps from this assertion directly into using its interpretation of the relevant education and experience sentence to attempt to demonstrate why, from Plaintiff's perspective, Caelum and three other offerors did not propose key personnel that meet Plaintiff's interpretation of the requirements.  The problem with this approach, among others, is that it disregards the plain language of the solicitation.

To begin with, Plaintiff's assertion completely ignores the phrase "related to" in the relevant sentence.  Plaintiff argues that for the program manager, for instance, the "assigned program area" is program manager.  *See, e.g.*, Pl.'s MJAR at 13 ("And, of course, his 'assigned program area' is Program Manager.").  Fair enough, but the solicitation does not state that the proposed program manager needs education/experience in the assigned program area; rather, it states that the program manager needs education/experience in an "IT discipline *related to* the assigned program area."  AR 647 (emphasis added).  So even if Plaintiff is correct that the assigned program area for the program manager is program management, it does not follow that the only relevant education/experience must be program manager experience.  Instead, the relevant education/experience must be in an IT discipline *related to* the program manager position.  The same is true for the project manager positions.

Moreover, just in case there was any confusion as to which IT disciplines are related to the program manager or project manager positions, the solicitation provides several examples: "Network Engineering, Network Management, Computer Science, Information Systems, Computer or Software Engineering, Management Information Systems, Computer Forensics/Security, etc."  *Id.*  Although this may appear to be a broad list, it makes sense that the relevant IT experience for the three individuals who were going to manage a contract to provide information technology, logistics, and cybersecurity support would be broad.  Plaintiff does not appear to take issue with the scope of the IT disciplines that will qualify, however.  Rather, Plaintiff's interpretation essentially deletes the phrase "related to" from relevant education/experience sentence in order to add a requirement that all IT experience had to be experience as a program or project manager.  While this interpretation would seem to aid Plaintiff's protest, it is not supported by the plain language of the solicitation.

The second issue with Plaintiff's interpretation is that Plaintiff inexplicably only applies it to modify the term "experience" in the relevant education/experience sentence.  Plaintiff does not use its interpretation to modify the term "education."  Thus, despite that fact that the sentence states that "[r]elevant *education/experience* must be in an IT discipline related to the assigned program area," Plaintiff argues that it is only *experience* that must be in an IT discipline related to the assigned program area.  This defies linguistics.  The two terms—joined by a slash—are clearly modified in the same way.  It cannot be that "experience" must be IT program or project

management experience as Plaintiff posits, but that "education" does not also have to be
education in IT program or project management.  The Court is unaware whether IT program or
project management education that fits Plaintiff's interpretation even exists, which, if it does not,
would render the sentence as interpreted by Plaintiff unreasonable.  But more importantly, if
Plaintiff's interpretation is correct, its own proposed program manager would not have the
requisite experience on the relevant education/experience matrices.[1]  In other words, Plaintiff's
interpretation of the relevant education/experience sentence would make its own proposal
"unacceptable."  Therefore, even assuming the Army erred, which the Court does not so hold,
Plaintiff itself benefited from the Army's error in the same way that Caelum and the other three
offerors did.  Accordingly, if Plaintiff's interpretation was correct, it would be barred from
raising this argument because Plaintiff actually benefitted from the alleged misinterpretation.
*See, e.g.*, *VS2, LLC v. United States*, 155 Fed. Cl. 738, 768 (2021) ("The simple fact is that VS2
cannot now complain about Vectrus's and the government's interpretation of the Solicitation
when VS2 relied upon the very same interpretation when preparing its proposal.").

Finally, Plaintiff's interpretation would render the sentence in the program and project
manager requirements regarding management experience superfluous.  *But see NVT Techs.*, 370
F.3d at 1159 (holding that an interpretation that "harmonize[s] and give[s] reasonable meaning to
all of its parts. . . . is to be preferred over one that leaves a portion of the contract useless,
inexplicable, void, or superfluous").  As noted above, the requirements for the program manager
position included "10 years leading 50 or more employees," and for the project manager
positions, "5 years leading 20 or more employees."  Read in context, these requirements for the
program and project managers were clearly intended to be the *management* experience
requirement for the positions, not the relevant education/experience sentence that follows as
Plaintiff suggests.  Rather, as explained above, that sentence sets forth the required IT
education/experience.  Given that the solicitation lists fifty-six specific positions that must be
filled, *see* AR 632–53, it would make sense that the program manager would need experience
managing fifty or more employees.  Yet, under Plaintiff's interpretation, apart from needing ten
years of experience managing fifty or more employees, the remainder of the supposedly
"necessary" program manager experience could literally be attained managing zero employees so
long as the proposed program manager's resume contains jobs with descriptions containing
words like "managing" or "leading."  *See* Oral Argument at 21:03–27:14, *Ascendant Serv. LLC
v. United States et al.*, (April 13, 2022) (No. 22-72).  Such an interpretation is unreasonable.

In sum, the solicitation is clear on its face.  A proposed program or project manager
needed experience in an IT discipline related to the assigned program area, including "10 years

---

[1] Under the plain meaning of the solicitation (the interpretation the Army applied), it is clear that
Ascendant's proposed program manager is qualified.  However, under Ascendant's proposed
interpretation, the individual lacks the required "IT program management" experience for the education
he received.  Under Ascendant's interpretation of the requirement, its proposed project manager only has
a little more than twelve and a half years of IT program management experience listed on his resume.
However, because he does not have a degree in IT program management as a linguistically consistent
application of Ascendant's interpretation would require, Ascendant's proposed program manager would
be required to have at least eighteen years' worth of IT program manager experience, which he does not
have according to his resume.

leading 50 or more employees" or "5 years leading 20 or more employees" depending on the position.  The Army evaluated proposed key personnel consistent with this meaning; therefore, Plaintiff's key personnel argument fails.

**C.      Only if the Court Finds in Its Favor with Regard to Key Personnel Does Plaintiff Asserts Prejudice with Regard to the Evaluation of the Management Factor**

In order to be successful in a bid protest, a protestor must establish prejudice twice.  First, it must establish prejudice as part of the standing inquiry.  *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)  ("[P]rejudice (or injury) is a necessary element of standing.").  Although Plaintiff only briefly addressed its standing to protest the award in its complaint, Compl. §§ 5–6, Plaintiff's standing was not questioned by either defendant, and it appears obvious that if Plaintiff were successful on *all* of its challenges to the Army's evaluation it would have a substantial chance of award and thus the prejudice threshold for standing purposes has been satisfied.  Second, a protestor must also establish prejudice as part of its case on the merits in order to prove that "an adjudged violation of law warrants setting aside a contract award."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005).  It is this second prejudice inquiry to which the Court now turns.

On the merits of a bid protest, it is not enough to show that an agency has stepped out of bounds; rather, a protestor must further show that the offending agency's conduct prejudiced it. *See, e.g.*, *CW Gov't Travel*, 154 Fed. Cl. at 736.  There is no presumption of prejudicial error, even in cases where the agency's action was irrational.  *Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("We hold that there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision.  The protestor must show prejudice under the usual standard.").  Instead, the analysis is one based in the doctrine of harmless error: "the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government."  *TRW Env't Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 67 (1989).  Therefore, "non-prejudicial errors in a bid process do not automatically invalidate a procurement."  *Labatt Food Serv. v. United States*, 577 F.3d 1375, 1380 (Fed Cir. 2009).  A finding of a prejudicial error requires that "[t]he correction of [the] error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party." *Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019) (internal quotations and citation omitted).  In other words, a plaintiff must "show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process."  *Bannum*, 404 F.3d at 1358 (citations omitted).

There is no doubt Plaintiff has established that if the Court agreed with Plaintiff's argument regarding key personnel *and all* of its arguments on additional errors the Army allegedly committed during the evaluation of the management factor, Plaintiff would have a substantial chance of being awarded the contract.  On its key personnel argument, had Plaintiff been successful, it would have eliminated four of the seven offerors leaving only two offerors in addition to Plaintiff in the competitive range.  Plaintiff then argues that with the two remaining offerors being awarded no strengths and no weaknesses, if it successfully removed its own weaknesses and received the five additional strengths it was entitled to, it would have a

substantial chance of being awarded the contract.  However, Plaintiff makes no argument as to how it would be prejudiced by the other errors it alleges with the Army's evaluation of the management factor, if it falls short on its key personnel argument.  In fact, at oral argument counsel for Plaintiff acknowledged that if the Court decided against it on key personnel, as a practical matter, Plaintiff's case was probably over.  Oral Argument at 1:53:29, *Ascendant Serv. LLC v. United States et al.*, (April 13, 2022) (No. 22-72) (during oral argument, the Court asked: "But if I disagree with you on key personnel, I think the case is over, is it not?" to which counsel for Plaintiff responded: "Practically, probably so.").  This acknowledgment also appears in Plaintiff's reply brief:

> It goes without saying that Ascendant's chances of award increase if more than one-half of the eligible bidders are suddenly (and correctly) deemed ineligible. That alone meets the substantial chance test.  *Then*, these evaluation errors that the Agency and Caelum so quickly dismiss *become* critically important.

Pl.'s Reply at 24 (emphasis added).  In other words, according to Plaintiff, only if Caelum and the three other offerors are eliminated from competition do the alleged errors with the management factor evaluation come into play.  This is also clear from the structure of the prejudice argument in Plaintiff's opening brief in support of its motion.  *See* Pl.'s MJAR at 34 ("With Caelum, ███████, ██ and ██████ removed from the competition, Ascendant, ██████ and ██████ would have been the last under consideration.  ██████ and ██████ each had zero strengths and zero weaknesses. . . .  As the Management factor was significantly more important than cost (AR602), *the agency would have weighed Ascendant's high rating against the two remaining offerors' Acceptable ratings*.") (emphasis added).

Accordingly, it is clear from Plaintiff's briefing and Plaintiff's counsel's acknowledgement at oral argument that Plaintiff is only raising the additional alleged errors in the evaluation of the management factor: (1) to strengthen its case for prejudice vis-à-vis the two offerors that would remain in the competition if Plaintiff were successful in its key personnel argument; and (2) to have the Court order corrective action on these alleged errors if corrective action were ordered because its key personnel argument was successful.

In short, Plaintiff has not offered an argument as to how its alleged errors with the management factor evaluation caused prejudice absent success on its key personnel argument. The burden, however, falls on Plaintiff not only to demonstrate that the agency acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, but additionally to establish that the agency's actions prejudiced Plaintiff.  Therefore, although the Court usually first examines whether the agency erred and then, if an error is established, looks to see whether the error caused prejudice, with regard to the alleged errors with the evaluation of the management factor, because Plaintiff failed to argue (much less establish) prejudice (absent success on its key personnel argument), the Court need not address the remainder of Plaintiff's arguments regarding the Army's evaluation of the management factor to deny Plaintiff's motion for judgment on the administrative record.

Moreover, even if Plaintiff had argued that it was prejudiced by the Army's alleged improper evaluation of the management factor, without eliminating Caelum from the

competition, it is unlikely Plaintiff would have been able to prove prejudice. Even assuming Plaintiff were able to prove that, but for the Army's alleged errors, its rating on the management factor would likely have been on equal footing with Caelum's, it still would have to establish that there was a substantial chance the government could rationally justify paying over $2,000,000 more for equally rated proposals. Without removing Caelum from the competition or challenging most of Caelum's assigned strengths, even if Plaintiff were successful in arguing that it should have been rated equal to Caelum, it is nearly impossible to conceive that in a best value procurement an equally rated proposal with an over $2.25 million price premium would be selected over an equally rated proposal. AR 8765 ("Paying $2 million more for an inferior proposal is not necessary."). Had Caelum and Plaintiff been equally rated on the management factor and the Army awarded the contract to Plaintiff for its more costly proposal, there likely still would have been a bid protest filed but Ascendant rather than Caelum would have been sitting at the table with the government in the courtroom. The Court suspects this is why Plaintiff did not argue that it was prejudiced by the other alleged errors in the management factor evaluation absent removing Caelum from competition.

**D.     Even Assuming Plaintiff Had Asserted that Errors in the Management Approach Alone Prejudiced It, Plaintiff's Disparate Evaluation Claim Would Nonetheless Fail**

Had Plaintiff argued that the alleged errors in the evaluation of its management approach prejudiced it—which it did not—Plaintiff would nonetheless fail to prove that its proposal and Caelum's were "substantively indistinguishable" enough such that the Army's allegedly erroneous assignment of weaknesses (or failure to assign strengths) would constitute disparate treatment. In short, Plaintiff fails to meet its burden on its disparate evaluation claim.

To prevail on a disparate evaluation claim, a protestor must show either that the agency unreasonably evaluated aspects of its proposal that were "substantively indistinguishable or nearly identical [to] those contained in other proposals," *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Sols., Inc. v. United State*s, 131 Fed. Cl. 565, 588 (2017)), or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines," *id.* (citing *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012)). Only if a protestor meets one of these two thresholds can the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Id.* at 1373. With regard to the first threshold, the substantially indistinguishable standard is important, because unless two (or more) proposals are substantively indistinguishable, the Court could exercise "free reign to second-guess the agency's discretionary determinations underlying its technical ratings," which "is not the court's role." *Id.* (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996)). In other words, if a protestor fails to demonstrate that the proposals at issue are "indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of 'minutiae.'" *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588 (quoting *E.W. Bliss Co.,* 77 F.3d at 449). Challenges to "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.,* 77 F.3d at 449.

Rather, "[s]uch subjective judgments will only be disturbed when inconsistencies are demonstrated." *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010).

Before addressing the merits of its claims, Plaintiff begins its disparate evaluation argument by asserting that the "substantively indistinguishable" standard described in *Office Design Group* only applies to the Court's review of assigned *deficiencies*. Pl.'s MJAR at 17. For analyzing the assignment of strengths and weaknesses, Plaintiff argues, the Court should instead use a "treated differently" standard. *Id.* (citing *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 690–691 (2009) and *Aero Corp. S.A. v. United States*, 38 Fed. Cl. 739, 769 (1997)). The Court declines to follow Plaintiff's misreading of the law. The "substantially indistinguishable" standard applies here, just as it does to all disparate evaluation claims.

First, although Plaintiff is correct that the key quote in *Office Design Group* mentions "deficiencies," both *Office Design Group* itself and the main case it cites, *Enhanced Veterans Solutions*, were not about deficiencies per se. In fact, *Office Design Group* did not even involve an adjectival rating system in which deficiencies were awarded; rather, the agency there evaluated proposals using a point system. *See Office Design Group*, 951 F.3d at 1371.[2] Moreover, the section of *Enhanced Veterans Solutions* cited in *Office Design Group* involved the awarding of *strengths*. The plaintiff there alleged "[t]hree specific examples . . . to demonstrate . . . alleged disparate treatment, as [the plaintiff] contends it did not receive *strengths* for similar qualities and elements that warranted *strengths* in the evaluations of other offerors." *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588 (emphasis added). Much like Plaintiff has in this case, the plaintiff in *Enhanced Veterans Solutions* "contend[ed] that if it had received these *strengths*, its Operational Approach would have received a Good rating and its Management Approach would have received an Outstanding rating." *Id.* (emphasis added).

Second, Plaintiff's proposed reading of *Office Design Group* to apply only to deficiencies makes little sense if one thinks of what a deficiency really is. It is the lowest rating on a scale that usually permits the assignment of strengths (generally when a proposal shows some value added, increased merit, or increased chance of successful performance), no rating (generally when a proposal meets minimum requirements), weaknesses (generally a flaw in the proposal that increases the chances of unsuccessful performance), and deficiencies (generally material failures to meet requirements or a combination of significant weaknesses that increase the chance of unsuccessful performance). Given this scale from which deficiencies are usually assigned, why would the Court analyze the allegedly erroneous assignment of a deficiency any differently than it would a strength or a weakness? Aside from a single quote from *Office Design Group*, Plaintiff offers no principle to support its reading of the caselaw. Yet, a strength and a deficiency are just different sides of the same coin, and a weakness is often akin to a lesser deficiency. Plaintiff offers nothing to address this fact.

---

[2] More recently, the Federal Circuit indicated that had it needed to reach the issue, it would have used the "substantively indistinguishable" standard to address a disparate treatment claim regarding an agency's alleged failure to assign various *strengths*. *See WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1380–82 (Fed. Cir. 2020) (finding that, even if the court accepted the plaintiff's arguments regarding unequal treatment in failing to credit the plaintiff certain *strengths*, the errors lacked prejudicial effect).

Moreover, the inquiry on a disparate evaluation claim is the same whether the disparate evaluation involves a strength, weakness, or deficiency: the Court is examining whether there is something in the protestor's proposal that is different from one or more other proposals that is rated higher. And the analysis of whether something is actually different between proposals, examines whether the proposals do, in fact, have real differences (such that the agency's evaluation was rational) or whether the proposals are "substantively indistinguishable" (such that the agency's disparate evaluation was irrational). In other words, it makes no difference in this type of analysis whether the Court is looking at strengths, weaknesses, deficiencies, or something else entirely. This is perhaps why, as Defendant-Intervenor correctly points out, multiple judges on this Court have applied the substantively indistinguishable standard to a variety of disparate evaluation claims rather than exclusively applying the standard to challenges of deficiencies alone, as Plaintiff suggests. *See* ECF No. 28 at 9 ("Caelum's Cross-MJAR") (collecting cases).

Accordingly, in analyzing Plaintiff's disparate evaluation claim, the Court will look at whether Plaintiff's proposal and Caelum's proposal were, in fact, substantively indistinguishable with regard to the weaknesses and strengths Plaintiff raises. With those guardrails in place, the Court now analyzes the merits of Plaintiff's disparate evaluation claims.

### 1. Challenged Weaknesses Assigned to Plaintiff

In evaluating the management factor, the Army assigned Plaintiff three weaknesses. Of those three assigned weaknesses, Plaintiff challenges two in this bid protest: (1) Plaintiff's failure to explain how it planned to mitigate risks it identified in its proposal; and (2) Plaintiff's proposal to use incumbent personnel ███████████████, and its failure to explain how it would staff all of the installations for which IT support is required.[3] AR 10156–57.

With regard to the first challenged weakness, Plaintiff's counsel conceded at oral argument that this weakness was properly assigned. Oral Argument at 1:44:13–1:44:19, 1:45:05–1:45:13, *Ascendant Serv. LLC v. United States et al.,* (April 13, 2022) (No. 22-72) (during oral argument, Plaintiff's counsel stated, regarding the weakness assessed for failure to mitigate risk: "I can see some internal comments in a chart where [Ascendant] is mitigating risks." To which the Court inquired: "Was that enough for the weakness though?" To which counsel answered that "*it was appropriate to give Ascendant a weakness for highlighting a risk, and not, professing to not mitigating it*, as they've got the internal comments in it . . . .").[4] This

---

[3] At no point in its briefing did Plaintiff challenge the weakness it was assigned for failing to describe in detail its plan for video teleconferencing support.

[4] During this exchange, Plaintiff's counsel attempted to raise for the first time that these two weaknesses were assigned for the same issue. Besides being incorrect, this argument has been waived as it does not appear in Plaintiff's motion for judgment on the administrative record (nor its reply brief, for that matter). *Novosteel SA v. United States et al.,* 284 F.3d 1261, 1274 (Fed. Cir. 2002); *Johnson v. United States*, 156 Fed. Cl. 385, 392 (2021). Moreover, the argument is incorrect. Although the identification of the risk of using staff ███████████ impacted two different areas of the evaluation of Plaintiff's proposal and, at least in part, contributed to the assignment of two weaknesses, this was not the assignment of two weaknesses for the same error. It just so happens that one paragraph in the chart revealed two problems with Plaintiff's proposal. Plaintiff received one weakness for proposing to use staff ███████████████████████████ (a personnel problem) *and* for failing to address how it was going to staff at least three of the four required

concession was for good reason—it appears that the portion of Plaintiff's proposal for which this
weakness was assigned is actually *draft* language left in the proposal by mistake.  AR 1623; *see
also KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 382 (2019) ("'An offeror has the
responsibility to submit a well-written proposal with adequately detailed information that allows
for a meaningful review by the procuring agency.'") (quoting *Structural Assocs., Inc./Comfort
Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009)).  In a table
appearing on page 1623 of the administrative record, which contains the portion of Plaintiff's
proposal in which it was supposed to identify performance risks and explain mitigation
measures, it would appear Plaintiff included its draft thoughts regarding what needed to be
addressed in terms of "███████████████████████":



is an issue for
us today.  It can be presented as a high severity risk in the proposal.  What are the
mitigation strategies to reduce the risk to a low severity?

AR 1623.  Although this paragraph may identify a performance risk, it certainly does not address
any mitigation measures for that risk.  Plaintiff attempted to dance around the obvious in its
briefing on this issue by arguing that the Army did not identify which of the categories of risk
Plaintiff failed to mitigate, *see* Pl.'s MJAR at 19–20, but it could not be more clear from the
administrative record that the above-quoted paragraph and one that appears four rows down[5] on
the table were the risks the Army labeled as "internal reflections" that Plaintiff failed to explain
how it would mitigate.  Obviously, raising two major performance risks, and failing to address
how either would be mitigated, rationally called for the assignment of a weakness, hence
counsel's concession at oral argument.

With Plaintiff's concession that the first weakness was merited (and its failure to prove
that the weakness was irrationally assigned absent its concession), the Court now turns to the
remaining contested weakness.  Regarding the second weakness it received, Plaintiff argues that

---

installations.  Moreover, Plaintiff received a second weakness for identifying two risks (one of which was
the personnel ████████████) in its proposal and not addressing how it was going to mitigate those
two risks.
   [5] In a separate row on this table in Plaintiff's proposal, Plaintiff, in what once again is obviously
draft language, writes:

████████████████████████████████████████████. I
would rate this as a medium/high severity. What are our mitigation strategies to reduce
the risk to a low severity?

AR 1623.

the Army evaluated it and Caelum disparately with regard to incumbent retention, because Plaintiff's proposal received a weakness for proposing to retain incumbent personnel, while Caelum's proposal did not.  Pl.'s MJAR at 18–19.  In Plaintiff's mind, "the incumbent staff ███ ████ will be the same if they stay with Ascendant or go to Caelum.  If their ████ █████, Caelum will have the same problem.  By that logic, Caelum should have received the same weakness, or nobody should have received it." *Id.* at 19 (footnote omitted).  Caelum counters this argument by asserting that its incumbent retention plan is not the same as Plaintiff's, in that Caelum only proposed to retain "desired incumbent staff" and proposed "specific measures to address any skill gaps," whereas Plaintiff proposed to attempt to retain 100 percent of the incumbent staff.  Caelum's Cross-MJAR at 12–13 (citing AR 2190, 2146).  In addition, both the government and Caelum point out that the weakness Plaintiff received goes beyond incumbent retention.  Rather, they both identify that this weakness was also assigned because Plaintiff's proposal did not indicate how it planned to staff the multiple locations called for in the solicitation—it only addressed staffing at the Army Test and Evaluation Command.  *See* Caelum's Cross-MJAR at 13; ECF No. 29 at 14 ("Gov.'s Cross-MJAR").

Even a cursory review of Plaintiff's proposal reveals that the portion of its proposal that relates to this weakness (Phase II Management Factor Requirement 10) is substantially distinguishable from Caelum's proposal.  The solicitation required IT logistics and support for at least three Army installations.  AR 249.  First, with regard to staffing all required installations, Plaintiff failed to indicate in its proposal that it planned to staff any location other than AETC/ Army Evaluation Center ("AEC").  But the proposal plainly requires support for multiple locations in addition to ATEC/AEC, including the Aberdeen Test Center ("ATC") and the Operational Test Command ("OTC") at Ford Hood.  AR 249.  Plaintiff's proposal is facially unclear as to whether it intends to staff all the locations required by the proposal.  *See KSC Boss All.*, 142 Fed. Cl. at 382 (holding it is the offeror's responsibility to submit a well-written proposal).  Although Plaintiff repeatedly notes its partnership with ████ to establish a "'pipeline' of readied personnel who fully meet the requirements of ATEC ITSS vacant labor categories," AR 1629, that is not a strong enough indication that Plaintiff intends to staff all required locations to make the Army's assignment of a weakness irrational.  Contrast this with Caelum's proposal that describes staffing at all required installations.  *See, e.g.*, AR 2162–64 (explaining its onboarding timeline and procedures for personnel); AR 8572 ("By having a list of personnel broken out by locality, Caelum is well prepared to support ATEC's needs wherever and whenever they arise.").  Because of the facial disparity between the two proposals, the Court will not further engross itself in the minutiae of this procurement and must leave the Army's reasonable evaluation as it stands, *see Enhanced Veterans Sols.*, 131 Fed. Cl. at 588, especially considering Plaintiff failed even to attempt to address this portion of the assigned weakness, *see generally* Pl.'s MJAR at 17–19.

Second, with regard to risk mitigation, as the Court explained above, Plaintiff's proposal contained what appears to be draft language that only *identified* but did not *address* risk mitigation.  Once again, as quoted above, in the section titled "Performance Risks and Mitigation Measures," Plaintiff's proposal contains the following two passages:

- ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ This is an issue for us today.  It can be presented as a high severity risk in the proposal.  What are the mitigation strategies to reduce the risk to a low severity?

- ████████████████████████████████████████

████████████████████████. I would rate this as a medium/high severity. What are our mitigation strategies to reduce the risk to a low severity?

AR 1623.

This identification of risks with no explanation of how those risks were going to be mitigated clearly warranted a weakness, with the Army reasoning that:

> Two risk mitigations appear to be internal reflections about the current state rather than actual mitigations. The proposal also did not provide mitigation for some elements in their risk chart. This was determined to be a weakness as the proposal failed to present risk mitigations for the elements in the risk chart, and failed to clearly identify actual mitigation strategies.

AR 8559.  Although the language in Plaintiff's proposal certainly would qualify as an explanation of a risk, it is not an explanation of risk mitigation measures as the proposal requires. Meanwhile, Caelum's proposal described strategies to mitigate the risk of obsolescence,[6] AR 2146, in addition to stating repeatedly that it would only hire *desired* incumbent staff while proposing procedures in the event that new staff needed to be hired.  AR 2190 ("Team Caelum is committed to recruiting and hiring all qualified incumbent staff . . . ."); *see also* AR 2163–64. Accordingly, Plaintiff has failed to demonstrate that the Army's assignment of this weakness was in error.

### 2.   Strengths Plaintiff Claims It Should have been Assigned

Plaintiff's arguments for why the Army should have assigned it several strengths on its management approach fare no better.  In sum, Plaintiff argues that five of the strengths[7] the

---

[6] Plaintiff concedes as much in its briefing.  *See* Pl.'s MJAR at 19 n.4 ("In fact, Caelum proposed to 'proactively address' skills 'gaps.' (AR2146.))."

[7] Plaintiff actually asserts that it should have been awarded as many as nine strengths, but curiously it only attempts to argue in favor of five strengths.  For the four remaining strengths it claims it should have received in its motion for judgment on the administrative record, Plaintiff literally lists the four alleged strengths it should have received and states: "[t]hese proposal features exceeded requirements and should have been rewarded with strengths."  Pl.'s MJAR at 29–30.  It should go without saying that Plaintiff obviously failed to meet its burden of persuasion on these four strengths for which Plaintiff offers *no argument* other than the above-quoted sentence.

Army assigned to Caelum's management approach also should have been assigned to Plaintiff. Pl.'s MJAR at 21.  The solicitation defined a strength as "[a]ny aspect of a proposal when judged against stated evaluation criterion, enhances the merit of the proposal or increases the probability of successful performance of the contract."  AR 211.  Caelum, for example, "received a strength for its 'solid process improvement plan.'"  *Id.* (citing AR 8569, 8754–55).  Yet, according to Plaintiff, it "proposed the same thing . . . ."  *Id.* (citing Plaintiff's proposal at AR 1636).  Caelum also "received a strength for aligning 'CMMI, ITIL4 standards through a strategic management approach.'"  *Id.* at 22 (quoting AR 8755).  But, Plaintiff asserts, it "also proposed to use CMMI and ITIL 4 . . . ."  *Id.* (citing Plaintiff's proposal at AR 1615, 1620).  Next, "Caelum received a strength for its retention plan," including its "robust Employee Care program," *id.* at 23 (quoting AR 8758), yet, Plaintiff argues, its "benefits package is virtually identical—and better in some respects—to what Caelum proposed," *id.*  Plaintiff provides a comparison of its own retention plan next to Caelum's, *see id.* at 23–25 (comparison chart citing AR 1632–33, 2150), and concludes that "[t]he companies' benefits are strikingly similar," *id.* at 25.  Finally, according to Plaintiff, "both [Plaintiff] and Caelum proposed virtually identical OCI mitigation strategies," *id.* at 25—such as performing initial and annual OCI briefings and stopping problematic activity— but "Caelum won a strength and Ascendant did not," *id.* at 26.

Plaintiff fails to carry its burden with regard to any of the strengths it claims it should have been assigned.  A disappointed bidder bears the burden to show an agency's decision, such as not assigning a strength, did not have a rational basis by a preponderance of the evidence. *Qwest Gov't Servs. v. United States*, 112 Fed. Cl. 24, 33 (2013) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'") (citing *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006)).  Moreover, in moving for judgment on the administrative record, a protestor is obligated to "draw[] upon and cite[] to portions of the administrative record that bear on issues presented to the court," RCFC 52.1(c)(1); *see also Facility Healthcare Servs., Inc. v. United States*, 158 Fed. Cl. 254, 257–58 (2022), because a judgment on the administrative record is properly understood as an expedited trial on a paper record.  *See Bannum*, 404 F.3d at 1354; *see also Moss v. United States*, 101 Fed. Cl. 611, 616 (2011).  Furthermore, the Court's duty in this inquiry is not to second guess "minutiae," but to determine if a plaintiff has pointed out any "inconsistencies in subjective judgments" or proposals that are "indistinguishable for purposes of the evaluation."  *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588.  As Judge Wolski explained in *Enhanced Veterans*,

> While these types of challenges can succeed when protesters demonstrate inconsistencies in subjective judgments, *see USfalcon*, 92 Fed.Cl. at 462, such inconsistencies require the existence of *nearly identical provisions in the proposals under consideration*.  When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of "minutiae" which we are not allowed to undertake, *see E.W. Bliss Co.,* 77 F.3d at 449.

131 Fed. Cl. at 588 (emphasis added).  The Court agrees with the government and Caelum that the proposals at issue are not substantively indistinguishable with regard to the alleged errors in assigning strengths; therefore, the Court cannot disturb the Agency's evaluation.

Plaintiff's arguments regarding the first three strengths it asserts it should have received (process improvement, linking standards and metrics to be successful, and aligning CMMI and ITIL4 standards) fail for two interplaying reasons.  As stated above, it is entirely a plaintiff's burden to prove by a preponderance of the evidence that an agency acted arbitrarily.  *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995–96 (Fed. Cir. 1996).  To meet that burden, the Court expects briefs on motions for judgment on the administrative record to contain substantive analysis and comparison that "draws upon" the administrative record, as RCRC 52.1 mandates, to demonstrate to the Court what agency action a protestor seeks to remedy and why that action was allegedly irrational.  Plaintiff, in arguing that it should have received strengths for (1) a "solid process improvement plan," (2) "linking standards and metrics to be successful," and (3) "aligning CMMI, ITIL4 standards through a strategic management approach," merely states the strength it thinks it deserves, cites to the relevant portion of Caelum's proposal, and asserts it should have received the same strength.  Pl.'s MJAR at 21–22 (internal quotations and citations omitted).  Such minimal briefing cannot be characterized as sufficiently drawing upon the administrative record or offering an argument sufficient to meet the substantively indistinguishable standard.  Analogizing a motion for judgment on the administrative record to a trial (which is what it is, albeit on a paper record), would make this approach akin to counsel presenting an opening statement setting forth what it intends to prove at trial but then failing to call the relevant witnesses to provide testimony or making any argument to show the relevancy of any evidence it did offer.  It is drawing upon the administrative record with reasoning and analysis that carries the day on motions for judgment on the administrative record, not unsupported assertions or unsubstantiated conclusions.  Because Plaintiff has not truly attempted to meet its burden of proof regarding these three strengths, the Army's analysis of these aspects of Plaintiff's proposal remains undisturbed.

Plaintiff next asserts that it should have received a strength for its "strikingly similar" employee retention plan.  Pl.'s MJAR at 24–25.  Plaintiff begins this argument with the statement that, at 94%, it has a higher employee retention rate than Caelum.  *Id.* at 23.  The problem with this assertion, however, is that it is incorrect.  It is one of Plaintiff's subcontractors that has a 94 percent employee retention rate, not Plaintiff.  *See* AR 1627 ("[O]ur strategic partner ███, having experience retaining 2000+ FTEs at ███ for 20+ years with an average retention rate of above 94% . . . .").  Moreover, Plaintiff does not cite to any place in the administrative record that shows what its employee retention rate actually is.  Plaintiff then turns to a chart it prepared containing a side-by-side of Plaintiff's and Caelum's employee retention plans, essentially requesting that the Court delve into the minutiae of comparing the two offerors' proposals and deciding whether any differences exist.  Clearly the plans are not identical, but Plaintiff offers no argument (other than pointing out a few differences) as to how its proposal and Caelum's are substantively indistinguishable.  The Court's cursory analysis of the proposals though quickly finds a very striking difference with regard to what Plaintiff describes as its "more generous" leave policy.  Plaintiff's plan provided for ███████████

20

████████████.  AR 1632.  However, Caelum's supposedly "less generous" leave plan actually provides for more ████████████████████████████████████████ ████████████████████████  Although the Court could examine other aspects of the employee retention plans to analyze the similarities and differences, Plaintiff has not made a concrete argument on this point beyond providing the side-by-side table and, absent some attempt to do so, it is not for this Court to substitute its judgment for the Army's.  The Army knows its priorities in evaluating the proposals' retention and leave policies, and the Court cannot disturb that absent a showing of irrationality.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The Court does not find the Army's evaluation of this aspect of each of the proposals irrational and, therefore, will not disturb the Army's determinations.

Finally, Plaintiff asserts that both it and Caelum proposed organizational conflict of interest ("OCI") mitigation plans that were "virtually identical," and, therefore, Plaintiff deserved a strength because Caelum received one for its plan.  ECF No. 26 at 25.  Here, Plaintiff comes closer to the mark, although once again Plaintiff leaves most of the legwork on comparing the relevant portions of the proposal to the Court.  However, having determined that Plaintiff still would have three weaknesses and no other strengths, even if the Court were to find in its favor and determine a strength was merited for Plaintiff's OCI mitigation plan, this one strength alone would be insufficient to change Plaintiff's marginal rating on management approach.  *See* AR 603 (stating that a "marginal" rating is warranted when "[t]he proposal has one or more weaknesses which are not offset by strengths.").  Therefore, even if the Court concurred that Plaintiff's and Caelum's proposals were substantively indistinguishable with regard to OCI mitigation, this lone alleged error would be non-prejudicial.

**E.      Plaintiff Fails to Demonstrate That the Army's Past Performance Evaluation Was Flawed or, If It Was, That It Prejudiced Plaintiff**

The Court next considers Plaintiff's objections to the Army's past performance evaluation.  In cases in which the Court "considers a bid protest challenge to an agency's past performance evaluation, 'the greatest deference possible is given to the agency.'"  *Def. Base Servs., Inc. v. United States*, 147 Fed. Cl. 424, 436 (2020) (quoting *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 293 (2007)); *see also Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) ("[I]n cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a triple whammy of deference.") (internal quotation omitted).  As such, "review of past performance evaluations is 'limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements.'"  *Id.* (quoting *Westech Int'l, Inc.*, 79 Fed. Cl. 272 at 294).

With regard to the Army's evaluation of Caelum's past performance, Plaintiff argues that, despite the substantial deference to which the government is generally entitled in evaluating past performance, the evaluation of Caelum's past performance was nonetheless irrational.  *See generally* Pl.'s MJAR at 30–31.  Specifically, Plaintiff contends that the Army's technical evaluators "mechanically evaluated Caelum's past performance" and simply "noted that one of

Caelum's subcontractors . . . received a cure notice[] but did no further analysis." *Id.* at 30.  In Plaintiff's view, "[t]he unknown circumstances of that cure notice *could have* negatively impacted Caelum's past performance evaluation."  *Id.* (emphasis added).  For instance, according to Plaintiff, "[a]nother offeror . . . also had a subcontractor with a cure notice," but "the evaluators found that the [agency involved] had rescinded [the cure notice].  Similarly, [a] proposed subcontractor . . . received three cure notices.  The [Army] analyzed [this issue] relatively extensively before concluding that [that offeror] was acceptable."  *Id.* at 31 (citations omitted).  Plaintiff maintains "it was arbitrary for the [Army] not to explore or discuss the cure notice Caelum's subcontractor received, like it did for others," and "[t]he higher-level evaluators missed it too."  *Id.*  In Plaintiff's view, instead of scrutinizing Caelum's past performance, "the source selection authority merely said that 'all offerors had acceptable Past Performance, and that factor is [therefore] not part of the tradeoff analysis.'"  *Id.* (quoting AR 8735) (alteration in original).

To put it mildly, Plaintiff's past performance argument lacks merit.  To begin with, Plaintiff concedes *ab initio* that it is not even certain an error occurred: the "cure notice *could have* negatively impacted Caelum's past performance evaluation."  That there "could have" been an error is legally insufficient to demonstrate that an agency action was irrational.  Moreover, as was explained in greater detail earlier in this opinion, in order to be successful, a protester must be able to show that the correction of the alleged error would yield a different result, that is to say that the error caused harm or prejudice.  However, even if Plaintiff's past performance argument is 100 percent correct (which for reasons discussed below it is not), it could not conceivably show it was prejudiced by the Army's alleged error based on the record before the Court.  This is because under the solicitation an offeror could *only* receive either an "acceptable" or "unacceptable" rating for past performance.  Therefore, in order for success on this argument to result in prejudice, Plaintiff would have to demonstrate that had the Army "correctly" evaluated the *single* cure notice that the parent company of one of Caelum's *subcontractors* received, it would have changed Caelum's past performance rating from acceptable to unacceptable.  Plaintiff, however, does not even attempt to argue that such a change in rating would result.  And with good reason.  In order to find that Caelum's past performance was unacceptable, the Army would have been required to conclude that it had "no reasonable expectation that the offeror will be able to successfully perform the required effort."  *See* AR 603.  Such a conclusion would have been irrational on this record.

First, the cure notice that allegedly "could have" affected Caelum's past performance rating was issued to a subcontractor.  Or more specifically, it was issued to the parent company of one Caelum's proposed subcontractors.  As the Army evaluator noted, the "issue was with a subcontractor, not the prime contractor."  AR 8647.  This is of course important because the subcontractor would only be performing some fraction of the overall work covered by the contract and thus any issues with performance by a subcontractor would not likely significantly impact the overall work on the contract.  In other words, the Agency was justified in concluding that the single subcontractor notice to cure was not likely to impact the likelihood of Caelum's overall successful future performance such that Caelum should have been rated unacceptable.

Second, the Army's evaluators determined that other offerors had objectively worse past performance histories than Caelum and yet those offerors' past performance was found to be

"acceptable."  For example, ███████ received a notice to cure but was still determined to be acceptable (AR 8214, 8646); ███████ received a notice to cure and a corrective action report but was still determined to be acceptable (AR 8255, 8648); ███ received a notice to cure but was still determined to be acceptable (AR 8442–43, 8447–48, 8657); ███████ had a number of issues noted in its record in the Contractor Performance Assessment Reporting System ("CPARS") but was still found to be acceptable (AR 8291–95); ███████ had several issues noted in CPARS but was still determined to be acceptable (AR 8316–18); and ███ had a number of performance issues but was still deemed acceptable (AR 8478–83).

Third, the Army *actually conducted* the analysis that Plaintiff alleges did not occur. Indeed, contrary to Plaintiff's assertion that the Army "did no further analysis" on Caelum's subcontractor's notice-to-cure, the record reflects—as the government correctly identifies—that

> [t]he evaluator also noted that [Caelum's subcontractor] had a "notice-to-cure" from another agency, and that additional explanation was required.  [AR 8237]. According to that evaluator though, that notice was favorably resolved to the Government's satisfaction.  *Id.*  In the consensus evaluation, it was noted that "[the subcontractor] quickly took steps to resolve the issue to the Government's satisfaction indicates a desire to keep the customer happy."  Tab 88b at AR8647. Because the issues was [sic] resolved favorably, the agency determined the cure notice did not indicate that the subcontractor would negatively impact Caelum's probability of meeting the solicitation's requirements.  *See id.*  Further, the evaluator noted that the "issue was with a subcontractor, not the prime contractor," which is important because the subcontractor would only be performing a small fraction of the work, and any issues with performance would not significantly impact contract work.  *Id.*

Gov.'s Cross-MJAR at 27.  In short, the administrative record demonstrates that the Army did exactly what Plaintiff accuses it of not doing with regard to this alleged past performance issue: it evaluated and resolved to its satisfaction the subcontractor's cure notice.

Furthermore, Plaintiff's attempted whataboutism concerning the Army's supposedly more thorough (or "reasonable") evaluation of other offerors' past performance falls apart upon even a cursory review.  For example, Plaintiff instructs the Court to look at offeror ███████ ███████ past performance evaluation—specifically concerning a cure notice—and contrast it to Caelum's.  *See* Pl.'s MJAR at 31 (citing AR 8646). Ironically, however, the Army spilled more ink in its explanation of Caelum's cure notice—which, as the evaluation makes clear, concerned a *subcontractor*—than for ███████ cure notice, which was issued to ███████ itself.  Perhaps Plaintiff confused which offeror's past performance allegedly received "no further analysis."  *Compare* ███████ evaluation at AR 8646 ("There was a 'notice-to-cure' listed on the Performance Events.  The issue was resolved to the Government's satisfaction and the cure notice was formally rescinded as of April 1, 2020 (pg 16). ███████ addressed the concern so the offeror is rated Acceptable.") *with* Caelum's evaluation at AR 8647 ("There was a 'notice-to-cure' . . . for support provided to DEA by subcontractor, ███████████████, that required explanation and it was favorably resolved on February 4, 2019 (pg 18).  The fact that the ███████ quickly took steps to resolve the issue to the Government's satisfaction indicates

a desire to keep the customer happy.  The issue was with a subcontractor, not the prime contractor.").  In short, a review of the record shows that the Army "examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" *WorldTravelService v. United States*, 49 Fed. Cl. 431, 441 (2001) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Finally, Plaintiff notably fails to point the Court to a single case that factually supports its contention that the government, in this instance, failed to "provide a coherent and reasonable explanation of its evaluation."  Pl.'s MJAR at 30.  Instead, Plaintiff simply concludes the Army "did not meet these standards."  *Id; see also* Caelum's Cross-MJAR at 21–22 ("Ascendant half-heartedly asserts that Caelum's past performance had an issue that was not properly considered.").  For this and all of the foregoing reasons, Plaintiff fails to demonstrate either an error or prejudice with regard to past performance.

## F.     Plaintiff Fails to Demonstrate that the Army's Tradeoff Analysis Was Unreasonable

Finally, the Court briefly addresses Plaintiff's objections to the Army's tradeoff analysis and resulting source selection decision.  Plaintiff argues that the Army's source selection decision was irrational.  *See generally* Pl.'s MJAR at 31–33.  Specifically, according to Plaintiff, the Army's source selection authority ("SSA") "accepted the underlying evaluations and allowed their errors to infect her source selection decision.  And while the SSA took time to compare certain proposals, she did not do so for Ascendant."  *Id.* at 32.  Plaintiff takes issue with the SSA's "four terse sentences" about its proposal, while the SSA "devoted at least several paragraphs to all but one other offeror . . . ."  *Id.*  Plaintiff contends that "[h]ad the SSA taken the time to independently assess [Plaintiff's] proposal, and compare it to Caelum's, she likely would have recognized the errors mentioned above."  *Id.* at 33.

The government counters that "the Army did not fail to comply with the FAR's requirements at sections 15.505 and 15.508 to conduct a 'comparative analysis.'  Nor did the SSA fail to document her 'own independent judgment.'"  Gov.'s Cross-MJAR at 29.[8]  According to the government, "[t]he SSEB report specifically considered the relative merits of each offeror, and, *in circumstances in which an offeror had been assessed strengths, evaluated whether the weaknesses were offset by strengths*, or otherwise affected the offeror's ability to perform."  *Id.*

The Court reads the government's argument as the better of the two.  While the FAR indeed demands a comparative assessment of proposals against the source selection criteria, *see* FAR 15.308, there is nothing in the record indicating the Army's SSA failed to do anything but that.  *See* Tabs 92, 93.  On top of that, "[a]n agency's contract award is [] *least* vulnerable to challenge when based upon a best value determination."  *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330

---

[8] It seems the government incorrectly cites to the FAR in this assertion.  FAR sections 15.505 and 15.508 concern "Preaward debriefing of offerors" and "Discovery of mistakes," respectively—neither of which relate to the assertion the government, in this instance, is making.  Given context elsewhere in the government's motion, as well as the verbiage the government quotes or paraphrases, the Court can discern what the government presumably intended to cite—FAR sections 15.305 and 15.308, concerning "Proposal evaluation" and "Source selection decision."

(Fed. Cir. 2004)) (emphasis added).  In other words, "this Court is to provide [] deference to the Agency's best value tradeoff."  *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 423 (2021) (citing *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009)); *see also E.W. Bliss Co.,* 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").

Moreover, "[i]t is well settled that the government is only required to make a 'cost/technical tradeoff . . . where one proposal is rated higher technically than another, but the other is lower in cost.'"  *Sirius Fed., LLC*, 153 Fed. Cl. at 424 (quoting *Indus. Prop. Mgmt., Inc. v. United States*, 59 Fed. Cl. 318, 324 (2004) (other citations omitted).  Yet here, Plaintiff challenges the adequacy of the Army's tradeoff analysis between its proposal and Caelum's— among *four* other offerors—which all had a higher technical rating *and* lower price.  *See* AR 8735 (showing offerors ███████, ███████, ███████, and Caelum proposed lower prices and had higher technical ratings than Plaintiff).  In sum, and under these facts, Plaintiff's tradeoff analysis contentions have no leg on which stand.

The Court also emphasizes a central problem for Plaintiff: as detailed throughout this opinion, the Court finds no error in the Army's underlying evaluations.  Thus, it cannot follow that the SSA's use of the underlying evaluations in any way "allowed [] errors to infect [the] source selection decision."  Pl.'s MJAR at 32.  While Plaintiff clearly desired a more fulsome explanation from the SSA, the Court politely reminds Plaintiff that it received three weaknesses and *zero* strengths, all the while having a total evaluated price that was higher than four other offerors.  *See* AR 8815.  In fact, Plaintiff was the *only* offeror to have weaknesses with no other potentially counterbalancing strength for which the SSA could articulate some semblance of a risk/reward analysis.  *See id.*  To put it bluntly, the Court finds nothing in the SSA's tradeoff analysis that raises even a specter of prejudicial error.

For comparison's sake, offeror ███████—noticeably not detailed in Plaintiff's motion— received one strength with its five weaknesses, providing the SSA an opportunity (even if brief) to articulate a potential tradeoff—which the Army, then, ultimately found was undesirable.  *See* AR 8746 ("Caelum's proposal has no weaknesses and nine strengths.  ███████ proposal offers one strength in having CMMI Development Level 3 and relevant ISO certifications, *but that strength is outweighed by the five weaknesses*. . . .  Paying $3 million more for an inferior proposal is not necessary.") (emphasis added).  The Court grants that Plaintiff may have desired more than "four terse sentences," but it only takes so much verbiage for an agency to articulate its reasons for choosing against "an inferior proposal."  *See Sirius Fed., LLC*, 153 Fed. Cl. at 423 ("While [Plaintiff] clearly believes a more detailed analysis should have been documented, that is not the issue for the Court to decide.  The issue for the Court is whether what the [agency] did was rational.  It was.").  The SSA's tradeoff analysis and resulting source selection decision was rational, and Plaintiff has made no compelling argument to the contrary.  Accordingly, Plaintiff's tradeoff analysis arguments fail.

## CONCLUSION

For the reasons set forth above and in the Court's order of May 9, 2022, Plaintiff's motions for judgment on the administrative record and for a permanent injunction are **DENIED**.

The government's and the Defendant-Intervenor's cross-motions for judgment on the administrative record are **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge